UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x

MATTHEW OREN,

        Appellant,

  -against-

ZACHARY B. KASS,
as Chapter 11 Trustee of
Anita Terrace Owners, Inc.

        Appellee.

------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. CV-04-4297(FB)(JMA)

*Appearances:*
*For the Plaintiff:*
MATTHEW OREN, *pro se*
77-17 138th Street
Flushing, NY 11367

*For the Defendant:*
ROBERT A. WOLF, Esq.
VADIM J. RUBINSTEIN, Esq.
1290 Avenue of the Americas
New York, NY 10104

**BLOCK, District Judge:**

    *Pro se* appellant Matthew Oren ("Oren") contributed to an unsuccessful bid to acquire the assets of Chapter 11 debtor Anita Terrace Owners, Inc. (the "Debtor"). Oren appeals four separate orders of the Bankruptcy Court for the Eastern District of New York, which (1) confirmed Trustee Zachary B. Kass's (the "Trustee") plan of reorganization; (2) granted the Trustee's attorneys' fees; and (3) denied two Orders to Show Cause requesting (a) vacatur of the Bankruptcy Court's confirmation order and (b) reconsideration of an order affirming the sale of the Debtor's assets to another bidder. By order dated October 22, 2004, the four appeals were consolidated. For the reasons set forth below, the Court

1

dismisses the appeals.

# I.

The Debtor owns land and property which include three 14-story apartment buildings located in Rego Park, Queens (the "Property"). In 1991 ViSutton Associates ("ViSutton") purchased the Property, financed in part by a $15 million mortgage from RB Asset, Inc. ("RB Asset"), and sponsored its conversion to a cooperative form of ownership. Upon conversion of the Property, ViSutton obtained additional financing in the form of a loan from RB Asset, which was secured by ViSutton's interest in the apartment building's unsold apartment units; RB Asset and ViSutton subsequently agreed to a modification of the mortgage which consolidated a portion of the additional financing with the underlying mortgage into a modified mortgage of about $19 million (the "Mortgage Modification"). The Debtor filed for Chapter 11 bankruptcy in June 2001, after it became unable to pay its real estate taxes or make payments on the mortgage.

## A. Bankruptcy Court Proceedings

The Bankruptcy Court appointed the Trustee in July 2001. The Trustee initially attempted to identify a third-party investor who would acquire the shares in the Debtor's unsold apartments, in return for providing funds sufficient to pay the modified mortgage held by RB Asset. In February 2003, RB Asset determined that this strategy was no longer in its economic interest and refused to go forward with the proposal; RB Asset subsequently filed a proposed plan of reorganization with the Bankruptcy Court.[1] The Trustee in turn commenced an adversary proceeding against RB Asset in connection with the Mortgage Modification, and submitted its own plan of reorganization (the "First Plan")

---

[1] RB Asset withdrew this plan some time later.

that was contingent upon success in the litigation against RB Asset.

After the Bankruptcy Court expressed concerns about the First Plan, the Trustee commenced settlement negotiations with RB Asset and other interested parties in an attempt to resolve various disputes. The parties eventually entered into a Settlement Agreement which resolved these disputes and formed the basis for an amended plan of reorganization (the "Second Plan"). As required by the terms of the Settlement Agreement, this plan provided for the sale of Debtor's Property and guaranteed full payment of the mortgage debt to RB Asset by June 30, 2004.

Over 200 of Debtor's shareholders filed objections to the Settlement Agreement; ROA Hutton LLC ("ROA"), a prospective bidder, also objected to the Trustee's proposed bidding procedures for the sale of the Property (the "Bid Procedures"), which required that all bidders (1) include a $5 million deposit with their bid; (2) submit the bid four days prior to auction; (3) provide proof of financial ability to consummate the sale, and (4) ensure payment to RB Asset by June 30, 2004. The Bid Procedures also granted the Trustee discretion to reject non-complying bids. Following a hearing, the Bankruptcy Court upheld both the Settlement Agreement and the Bid Procedures (the "Bid Procedures Order"), and neither ROA nor Oren appealed these orders.

The Trustee subsequently entered into a contract to sell the Debtor's Property to Anita Rescue LLC, subject to the Trustee's acceptance of a higher and better bid. Oren was unable to raise the necessary funds to submit an individual bid, and instead contributed $200,000 towards a bid submitted by ROA. Because ROA's bid (1) was received four days after the deadline; (2) failed to include the required $5 million deposit; (3) did not provide proof of the financial resources necessary to effectuate the purchase,

3

and (4) would not result in payment of the mortgage by the June 30 deadline, the Trustee rejected ROA's bid and did not allow it to participate at auction. In a hearing held on May 25, 2004, the Bankruptcy Court overruled ROA's objection that it should have been allowed to participate in the auction, and found that the winning bidder, Pinnacle Acquisitions LLC ("Pinnacle"), was a good faith purchaser under Bankruptcy Code § 363(m). The Bankruptcy Court subsequently entered an order which approved Pinnacle as the winning bidder (the "Successful Bidder Order").[2] A disclosure statement regarding the details of the Second Plan, which incorporated Pinnacle's bid to refinance rather than liquidate the property, was approved by the Bankruptcy Court and submitted for review to all parties. The Second Plan was unanimously accepted by all parties who voted upon it, including all shareholders of the Debtor who voted.

Neither ROA nor Oren appealed the Successful Bidder Order; instead, on June 16, 2004, two days prior to the Confirmation Hearing on the Second Plan (the "Confirmation Hearing"), Oren filed his first Bankruptcy Court Order to Show Cause pursuant to Fed. R. Civ. P. 60(b)(2) ("First OTSC") requesting that the Bankruptcy Court stay confirmation of the Second Plan and reconsider the Successful Bidder Order, in light of what Oren alleges was newly discovered evidence about Pinnacle's bid, which required a 29% increase in shareholder maintenance fees. Alternatively, Oren requested that the Bankruptcy Court decline to confirm the plan because it was not in the best interests of the Debtor and did not meet certain substantive requirements of 11 U.S.C. § 1129, which sets forth the prerequisites for confirmation of a reorganization plan under Chapter 11.

---

[2] A copy of Pinnacle's winning bid was appended to the order.

The Confirmation Hearing was held on June 18, 2004; during the hearing the Bankruptcy Court also addressed Oren's First OTSC. Oren, who was represented by counsel at the Confirmation Hearing, explained that he was a "presumptive bidder" who sought an opportunity to have his bid considered by the Trustee. Tr. of Confirmation Hr'g, at 62.[3] The Bankruptcy Court noted that even assuming Oren had standing to present his objections to the Second Plan, the relief Oren requested would require the Court to set aside the Bid Procedures Order, the Successful Bidder Order, and the Settlement Agreement, to which Oren had not objected or filed timely appeals. The Bankruptcy Court then determined that the "new evidence" that formed the basis for Oren's Rule 60(b)(2) motion had become part of the public record on May 25, 2004, and was available to Oren at least by May 28, 2004, when the Bankruptcy Court signed the order approving Pinnacle's bid. Because Oren could have discovered this information through the exercise of due diligence in time for him to file a motion for reconsideration under Fed. R. Civ. P. 59, the Bankruptcy Court concluded that Oren could not meet the requirements for relief from judgment under Rule 60(b). An order confirming the Second Plan was entered on July 18, 2004 (the "Confirmation Order"); on June 22, 2004 the Bankruptcy Court entered a second order approving the fee applications of the Trustee's professionals, including his attorneys' fees (the "Fee Order").

On June 25, 2004, following confirmation of the reorganization plan, Oren filed a second Order to Show Cause ("Second OTSC") in the Bankruptcy Court pursuant

---

[3]At this point in the proceedings Oren appears to have been acting solely on his own behalf; although ROA entered an appearance through its own attorney at the Confirmation Hearing, it did not raise any objections to the Second Plan.

to Fed. R. Civ. P. 60(b)(1), (2), (3), and (6), seeking (1) a declaration that he had standing to bring the First OTSC as a bidder who had contributed to ROA's joint bid; (2) vacatur of the Confirmation Order, and (3) reconsideration of the Successful Bidder Order. The Bankruptcy Court did not make any finding regarding Oren's standing, but allowed him to be heard on his Second OTSC on May 28, 2004. At this hearing, Oren, now proceeding *pro se*, argued that his proposal was better for the shareholders' interests than the bid incorporated into the Second Plan and that he should be allowed to submit a bid for the Property; Oren also arugued that the Second Plan violated various substantive provisions of the Bankruptcy Code governing reorganization under Chaper 11.

The Bankruptcy Court again informed Oren that in order to grant the relief sought, it would have to vacate not only the Confirmation Order, but the Settlement Agreement, Bid Procedures Order and Successful Bidder Order, none of which Oren had timely appealed from. The Bankruptcy Court stated that Rule 60 could not be used as a substitute for an appeal of these orders, and found that there was no basis for granting the relief sought under the rule. The Court also expressly found that even had ROA been allowed to submit a bid, it could not have been found to be higher or better because ROA admitted that its bid would not result in payment to RB Asset by June 30, as required by the Settlement Agreement.[4]

The Bankruptcy Court also rejected Oren's arguments that the Confirmation Order should be vacated for failure to comply with various requirements of Chapter 11 reorganization, explaining that it had previously made the findings required for plan

---

[4]During the hearing, RB Asset confirmed that it would consider failure to adhere to this deadline to be a breach of the terms of the Settlement Agreement.

confirmation, that these findings had not been appealed from, and that Oren had no basis for raising any of these issues in a Rule 60(b) motion. The Bankruptcy Court issued an order denying the Second OTSC on June 30, 2004, and the sale of the Debtor's property to Pinnacle was subsequently consummated.

**B. District Court Proceedings**

On June 28, 2004, ten days after the June 18 Confirmation Hearing, Oren filed a notice of appeal from the Confirmation Order and the denial of the Second OTSC. On June 29, 2004, Oren filed a second notice of appeal from the "confirmation and other orders of June 18, 2004," which purported to be an amendment to his June 28 notice of appeal. The parties dispute the subsequent course of events, with the Trustee arguing that on July 15, 2004, Oren filed four new notices of appeal from the Confirmation Order, Fee Order, and two Orders to Show Cause which he backdated to June 28, 2004; Oren asserts that the appeals were filed prior to July 15, 2004 but that due to confusion on the part of the Court clerk, the appeals were not docketed until that date.

On October 22, 2004, this Court entered a briefing schedule which directed Oren to file his brief by November, 15, 2004; the Trustee to file his brief by December 3, 2004, and Oren to file his reply brief by December 17, 2004. In compliance with the Court's scheduling order, the Trustee timely filed its brief on December 3, 2004. Several letters from Oren followed, requesting extensions of time for Oren to file his brief. On February 17, 2005, the Court ordered that Oren should file his brief no later than March 5, 2005. The Court's order stated that no more extensions of time to file would be granted, and that Oren's failure to file his brief by the date ordered could result in the Court deciding the appeal upon the papers already filed. On March 5, 2005, Oren filed a 293-page "Letter

Application and Reply to Appellee's Premature December 3, 2004 Brief."

Although Oren's brief is extremely lengthy and disorganized, and many of his arguments are difficult to decipher, the Court has been able to glean the following arguments and claims from a careful reading of Oren's submission. With respect to his appeal of the Confirmation Order, Oren argues that the Second Plan violated various provisions of Chapter 11, including (1) 11 U.S.C. §§ 1125 and 1127, which require the Trustee to submit a new disclosure statement to the Bankruptcy Court following modification of a proposed plan;[5] (2) 11 U.S.C. §1129(c), which requires consideration of the preferences of the creditors and equity holders in determining which plan to confirm if more than one proposed plan of reorganization has been submitted, and (3) 11 U.S.C. § 1129(a)(11), which provides that the Bankruptcy Court may only confirm a plan if it is not likely to be followed by the liquidation or need for further reorganization of the debtor.[6] Oren also argues that the Trustee violated 11 U.S.C. § 363(b) by failing to disclose that certain assets were part of the Property being offered for sale as part of the Second Plan; that Pinnacle was not a good faith purchaser within the meaning of 11 U.S.C. § 363(m), and

---

[5]Oren appears to argue that the alleged plan modification occurred when the Trustee accepted Pinnacle's bid, which sought to refinance the Debtor's property rather than liquidate it, as anticipated by the initial contract of sale between the Trustee and Anita Rescue. The Court notes, however, that the disclosure statement specifically provided that bids for the Property could either be in the form of a higher purchase price for a sale of the Property that would result in the conversion of the property from a cooperative to a rental, or in a form that would preserve the Debtor's status as a cooperative and permit the shareholders to retain the equity interest in their apartments.

[6]Oren argues that ROA's proposal was the only plan that would have complied with 1129(a)(11), and that the bid accepted by the Trustee is over-leveraged and places the Debtor at risk.

that the sale process was unfair.

With respect to the Bankruptcy Court's denial of his successive Orders to Show Cause, Oren argues that he was entitled to relief under Rule 60(b) because the evidence regarding the increase in maintenance fees under Pinnacle's bid could not have been discovered by him in time to make a motion for reconsideration under Rule 59. Finally, Oren asserts that the Trustee's professionals are not entitled to their fees because the Trustee breached his fiduciary duties through various actions, including his proposal of bidding procedures which prevented Oren's bid from being placed before the shareholders.[7]

The Trustee responds that Oren's appeal should be dismissed because (1) Oren did not timely file his notices of appeal;[8] (2) Oren lacks standing to appeal; (3) Oren's

---

[7] In addition to his substantive arguments upon appeal, Oren also requests additional time to supplement his brief with a "more formal case-law supported brief on appeal." Oren presents a litany of complaints to support his argument that he should be granted such additional time, including that (1) he is proceeding *pro se*; (2) he lost the assistance of two employees who had been helping him prepare his appeal, and (3) he was recently called away by two family health emergencies, including a death. Oren also states that he is still without certain "key" documents from the Bankruptcy Record, which Appellee should be required to supply because it would be a hardship for Oren to go to the Courthouse and copy the documents.

The Court denies Oren's request, noting that he had over four and a half months from the time the briefing schedule was entered, and over eight months from the time he filed his notices of appeal, to prepare his brief. This was sufficient time for Oren to prepare a 293-page submission, far exceeding the Court's page limit, and in light of the voluminous amount of factual material and number of legal arguments contained in the brief which the Court has been required to sort through and parse out, Oren's representation that he has not had enough time to properly prepare his submission is simply unpersuasive.

[8] The Trustee's brief also argues that Oren's appeal should be dismissed as untimely due to Oren's failure to file his brief by November 15, 2004, as directed by the

appeal is moot, and (4) Oren's appeal is barred by the doctrine of equitable mootness. Alternatively, the Trustee argues that Oren's appeal from the Confirmation and Fee Orders lack merit, and that the Bankruptcy Court did not abuse its discretion in denying Oren's Orders to Show Cause pursuant to Rule 60(b). Because, as discussed below, the Court agrees with the Trustee that Oren lacks standing to appeal the Fee Order, and determines that Oren's remaining appeals are moot, it does not reach the merits of Oren's appeals.

II.

## A. Standard of Review

Because Oren is proceeding *pro se*, his pleadings must be read liberally and interpreted as raising the strongest arguments they suggest. *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). Nevertheless, although *pro se* submissions are "held 'to less stringent standards than formal pleadings drafted by lawyers,'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)), a *pro se* plaintiff is not "exempt ... from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

## A. Timeliness of Oren's Appeals

The Trustee argues that Oren's notices of appeal were not timely filed, and that the Court therefore lacks jurisdiction to hear the appeals. Fed. R. Bankr. P. 8002 states that a notice of appeal "shall be filed with the clerk within 10 days of the date of the entry of the judgment, order, or decree appealed from." "Within 10 days after filing the notice

---

Court in its Scheduling Order. Because the Court subsequently ordered Oren to file his brief no later than March 5, 2005, and Oren complied with this order, this argument is moot.

10

of appeal . . . the appellant shall file with the clerk and serve on the appellee a designation of the items to be included in the record on appeal and a statement of the issues presented on appeal." Fed. R. Bankr. P. 8006. The ten-day time limit set forth in Rule 8002 is jurisdictional in nature, and an appellant's failure to comply with this deadline deprives a district court of jurisdiction to consider the appeals on the merits. *See, e.g., In re Simeon,* ___F.3d___, 2005 WL 2050108 at *1 (2d Cir. Aug. 26, 2005) (citing *Browder v. Dir., Dept. of Corr. of Ill.,* 434 U.S. 257, 264 (1978).

The Trustee agrees that Oren filed an initial notice of appeal from the Confirmation Order and Second OTSC on June 28, 2004, within the ten-day time limit, and that on June 29, 2004 Oren filed what he describes as an amended notice of appeal from "the confirmation and other orders of June 18, 2004" and the Second OTSC. However, the Trustee notes that Oren subsequently failed to timely file a designation of the items to be included in the record on appeal and a statement of the issues presented on appeal, as required by Rule 8006. According to the Trustee, Oren instead waited until July 15, 2004 to file four separate notices of appeal from each of the orders, which the Trustee asserts Oren backdated to June 28, 2004. The Trustee argues that by filing the four successive notices of appeal on June 15, Oren signified that he had abandoned his initial notice of appeal dated June 28, 2004, and that his appeals are therefore untimely.

The Trustee does not cite any authority for the proposition that an appellant may be deemed to have abandoned his initial appeals by filing successive notices, or that an otherwise timely appeal may be deemed untimely as a result. Because Oren is proceeding as a *pro se* appellant whose submissions must be construed liberally, and because as discussed below the Court concludes that the appeals must in any event be

11

dismissed because they are moot or because Oren lacks standing to appeal, the Court will simply assume, without deciding, that the notice of appeal filed on June 28, 2004 was sufficient to provide interested parties with notice of Oren's intent to appeal and that it satisfied the requirements of Rule 8002.

## B. Standing

Trustee argues that Oren lacks standing to appeal because he was not an individual bidder, but merely contributed to a bid submitted by ROA, who has not appealed any of the Bankruptcy Court's orders. In the alternative, the Trustee argues that even if Oren is deemed to be a bidder, the speculative profit he might have made had ROA succeeded in purchasing the property at auction is insufficient to confer standing upon him. Oren responds that he has standing not only as an aggrieved bidder in his own right, but also on behalf of ROA, whose president has attested to Oren's status as a joint venture bid partner and which has assigned ROA's interest in both the joint bid and any appeal rights to Oren. Alternatively, Oren argues that he has standing as a representative of the Debtor's shareholders, who were the "sole plan-funders" for ROA and Oren's "joint venture condominium conversion reorganization plan bid," and who would have been his "partners" had his proposal been selected by the Trustee.

Finally, Oren argues that even if he would not otherwise have standing as an aggrieved bidder, an exception should be made because the bidding and sale procedures were unfair and there was collusion between the Trustee and other interested parties, as evidenced by the fact that the Trustee allegedly delayed in distributing information to him prior to the bidding process.

12

> To have standing to appeal from a bankruptcy court ruling in this Circuit, an appellant must be an 'aggrieved person,' a person 'directly and adversely affected pecuniarily' by the challenged order of the bankruptcy court. Such a test is stricter than Article III's 'injury in fact' test for standing. The stringency of our rule is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell for the orderly disposition of bankruptcy matters.

*In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997) (citations omitted). Although unsuccessful bidders therefore generally lack standing to challenge a bankruptcy court's order directing a sale, a disappointed bidder who challenges the intrinsic fairness of the sale will be held to have standing to appeal. *See id.* at 388. *See also O'Brien v. Environmental Energy, Inc. v. NRG*, 181 F.3d 527, 531 (3d Cir. 1999).

In challenging both the Confirmation Order, which affirmed the sale of the Debtor's Property to Pinnacle, and the two Orders to Show Cause, which sought reconsideration of the order approving Pinnacle as the successful bidder, Oren asserts that the bidding procedures were intrinsically unfair and that he was thereby deprived of the ability to fully participate at auction. Oren therefore has standing to appeal these orders. However, Oren lacks standing to challenge the Bankruptcy Court's Fee Order. Entry of the Fee Order did not "directly and adversely" affect Oren pecuniarily, and because the proceeds from the Trustee's fee would be returned to the shareholders, Oren would not benefit financially if the Fee Order were overturned. *See In re Gucci*, 126 F.3d at 388 (stating that standing to appeal a bankruptcy court order requires that the appellant be "directly and adversely affected pecuniarily" by that order).

## C. Mootness

Although Oren has standing to appeal the Confirmation Order and two Orders to Show Cause, these appeals must be dismissed as moot. 11 U.S.C. § 363(m) provides that "the reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." *Id.* Once a bankruptcy sale has been consummated, § 363 deprives courts of jurisdiction to review that sale except on the limited issue of whether it was made to a good faith purchaser. *See In re Gucci*, 105 F.3d 837, 838 (2d Cir. 1997) ("We hold that pursuant to Bankruptcy Code § 363(m) we have no jurisdiction to review an unstayed sale order once the sale occurs, except on the limited issue of whether the sale was made to a good faith purchaser."); *see also In re Colony Hill Associates*, 111 F.3d 269, 273 (2d Cir. 1997) (upholding district court's dismissal of appeal of a consummated sale as moot, where potential bidder argued that its bid should have been considered even though it did not comply with the approved bidding procedures). Where the sale has been consummated, an appeal challenging that sale will be held moot even though it "might raise [other] meritorious arguments." *Id.* at 840. *See also In re Sax*, 796 F.2d 994, 998 (7th Cir. 1986) (holding an appeal challenging an unstayed sale to be moot and noting that this rule furthers the important interest of finality by "minimiz[ing] the chance that purchasers will be dragged into endless rounds of litigation to determine who has what rights in the property. Without the degree of finality provided by the stay requirement, purchasers are likely to demand a steep discount for investing in the property.").

While the Bankruptcy Code does not define the meaning of good faith, the Second Circuit has held that the phrase "encompasses one who purchases in good faith and for value." *In re Colony Hill Associates*, 111 F.3d at 277 (internal quotation marks omitted). The auction price is sufficient to establish that a purchaser paid "value," as long as the purchaser acted in good faith. *See id.* "Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . . . A purchaser's good faith is lost by 'fraud, collusion between purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders,'" and does not extend to an attack on a purchaser's "general business practices." *In re Gucci*, 126 F.3d at 390 (citations omitted).

The Confirmation Order entered by the Bankruptcy Court required Pinnacle to purchase and refinance the Debtor's Property in order to satisfy the Debtor's creditors, and Oren's challenge to the Confirmation Order seeks to overturn this sale. Similarly, Oren's First and Second OTSC sought either a stay or vacatur of the Confirmation Order, as well as vacatur of the order approving Pinnacle as the winning bidder for the Debtor's Property. Like the appeal of the Confirmation Order, the relief sought by Oren's appeal of his First and Second OTSC would require the Court to overturn the sale of the Debtor's Property to Pinnacle. Because the sale was not stayed and has already been consummated, Oren's remaining appeals are therefore moot except to the extent that he challenges the good faith status of Pinnacle.

In attempting to demonstrate that Pinnacle was not a good faith purchaser, Oren first alleges that the Trustee did not disclose that certain assets, such as the Debtor's garage plus 14 lobby apartments and professional space, were to be sold as part of the Debtor's Property. This argument is without merit. The disclosure statement that was

15

prepared by the Trustee and approved by the Bankruptcy Court clearly describes the assets to be sold to Pinnacle under the Second Plan, including the land owned by the Debtor and "(a) the buildings and other improvements situated on the Land (collectively, the "Buildings"), (b) all easements, rights of way, reservations, privileges, appurtenances, and other estates and rights of Seller pertaining to the Land and the Building, (c) all fixtures, machinery and other articles of personal property attached or appurtenant to, or used in connection with, the Land and/or the Building and owned by the Seller." *See* Trustee's Second Amended Disclosure Statement Pursuant to 11 U.S.C. §1125, Exhibit E, at 1. Given the broad description of the Property being offered for sale, Oren's argument that the Trustee somehow concealed the fact that the apartment buildings' garage, lobby apartments, or professional space would also be included clearly fails.

Oren also argues that Pinnacle was not a good faith purchaser because its bid violated 11 U.S.C. § 1129(a)(5)(A)(ii) by giving control of the co-op board back to a new sponsor, in violation of an unspecified policy of the New York State Attorney General.[9] Oren does not cite to the policy, explain where it may be found, or describe specifically how Pinnacle's plan violates it. Even assuming that such a policy exists and that Oren

---

[9] 11 U.S.C. § 1129(a) provides:

(a) The Court shall confirm a plan only if all of the following requirements are met:

...

(5)(A)(ii) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as director, officer, or voting trustee of the debtor . . .; and
(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy . . . .

16

could show how the plan violates this policy, this does not approach the type of "fraud, collusion between purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" that the Second Circuit has held is required to deprive a purchaser of good faith status. *In re Gucci*, 126 F.3d at 390.

**D. Equitable Mootness**

The Court also concludes that Oren's appeals are equitably moot. "The doctrine of *equitable* mootness is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *MAC Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002). The Second Circuit has held that where a plan of reorganization has been substantially consummated, an appeal challenging that reorganization will be presumed moot unless (1) the court can still order some effective relief; (2) such relief will not affect the "re-emergence of the debtor as a revitalized corporate entity"; (3) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (4) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings," and (5) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." *In re Chateaugay Corp.*, 10 F.3d 944, 952-53 (2d Cir. 1993) (citations omitted). An appellant must demonstrate that it meets all five requirements in order to overcome this presumption. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136,

144 (2d Cir. 2005). A plan is "substantially consummated upon "(i) transfer of substantially all of the property proposed by the plan to be transferred; (ii) the reorganized debtor's assumption of the debtor's business; and (iii) commencement of distribution under the plan." *Id.*

According to the Trustee, following confirmation of the Second Plan, and in accordance with the provisions of that plan, all of the property proposed to be transferred was sold to Pinnacle, and the Debtor thereafter "(a) satisfied in full a $28 million obligation to the former mortgagee with whom the Debtor had litigated for over 5 years; (b) obtained, through Pinnacle, the current $30 million mortgage; (c) settled a 5 year litigation with the Sponsor of the co-op; (d) as part of that settlement, conveyed the shares and proprietary leases for 238 co-op apartments owned by the Sponsor to Pinnacle; (e) entered into a 99-year lease with Pinnacle for the Property's garage space and its commercial apartments; (f) retained a new management company; and (g) made over $35 million of distributions to, among others, various New York State and federal taxing authorities." Appellee Br. at 33. Oren does not dispute the occurrence of any of these transactions or argue that the reorganization has not been substantially consummated in the 15 months following the Second Plan's confirmation.

Oren's appeals, if successful, would require not only reversal of the sale to Pinnacle, but the unraveling of numerous transactions contingent upon consummation of that sale. The success of the reorganization plan was dependent at least in part upon the settlement of litigation between the Debtor and various other parties and full payment to RB asset by July 30, 2004. The Court therefore concludes that undoing this sale, which allowed the latter condition to be met, would negatively affect the Debtor's recent re-

emergence as a revitalized corporate entity pursuant to the terms of the Second Plan approved by all parties. The Court also concludes that reversal of the sale which formed the basis for the Debtor's reorganization would require the numerous transactions described by the Trustee which hinged upon the timely sale of the Property to Pinnacle to be unraveled, thereby creating "an unmanageable, uncontrollable situation for the Bankruptcy Court." *In re Chateaugay*, 10 F.3d at 953. Because the plan of reorganization has been substantially consummated, and because Oren is unable to demonstrate that the presumption of mootness should not apply, the Court finds that Oren's appeals should also be dismissed as equitably moot.

### IV.

The Court concludes that Oren lacks standing to appeal the Bankruptcy Court's Fee Order, and that Oren's appeals from the Confirmation Order and the denial of the two Orders to Show Cause are moot. The appeals are hereby dismissed.

**SO ORDERED.**

FREDERIC BLOCK
United States District Judge

Brooklyn, NY
September 23, 2005

19